CHAUNCEY H. STRICKLAND

*v.*

NATIONAL SALT COMPANY.

[Decided June 6th, 1910.]

1. The negotiability of a certificate issued by a company, whereby it agreed to pay a certain sum at the office of a trust company, in equal semi-annual installments, was not affected by a provision that the failure to pay any installment when due should make all future installments at once due and payable.

2. Certificates issued by a company provided for payment of a certain sum at the office of a trust company in semi-annual installments; that the failure to pay any installment when due should make all future installments at once due and payable; that until such default occurred the company might at any time discharge its liability by paying the amount of all future installments to the trust company in trust to pay the same to the "registered holders" of the certificates.—*Held*, that the "registered holder" was the party appearing on the book of the trust company as the holder of the paper.

3. Such certificate, not bearing on its face a promise to pay the amount named to the holder or owner, absolutely and at all events, was not negotiable, the company retaining the right to pay the entire amount to the trust company in trust for the registered holders of the certificate, and the trust company being discharged by payment to the registered holder, who might not be the real owner, the certificates being assignable by endorsement and delivery.

4. An agreement between the stockholders of corporations whereby in order to effect a consolidation of the two companies one company was to issue stock worth a certain sum in payment for stock of the other company which was worth much less, was invalid, and no agreement relating thereto could be enforced.

On bill, &c.

*Mr. George R. Beach, Mr. Joseph G. Dean* (of New York), *Mr. Hand* (of New York), for the claimants, appellants.

*Mr. Charles W. Fuller, Mr. Henry B. Twombly* (of New York), for the receivers of National Salt Company, respondents.

STEVENSON, V. C. (orally).

In the matter of the appeals of certain claimants from the adjudication of the receivers in the case of *Strickland* v. *National Salt Company,* disallowing their claims, my conclusion is that the adjudication of the receivers should be affirmed.

It would be impossible for me at present to traverse the whole of this complicated case, and it is not necessary that I should do so. I understand the case will be carried to the court of appeals; it is very proper that it should. Counsel have, before me, argued carefully and thoroughly all the points involved perhaps, with the exception of one which I intend to touch upon. I doubt if any elaborate opinion of this court would be of great value to the court above. It would be a little more than an argument coming from the bench by the side of arguments coming from counsel, which will fully cover the whole case. There is just one line of thought and investigation, however, which I shall follow out to some extent, in order that, with the suggestions that I shall make, counsel may fully argue this case in the court above.

The first question which perhaps conveniently may be taken up is, what is the character in respect of negotiability of the certificates sued on by these claimants? In my judgment they are not negotiable. They do not exhibit on their face a promise, on the part of the National Salt Company, to pay a sum of money in installments to the holder of the instrument absolutely and at all events, and I find, very much to my surprise, that the difficulty in the way of attributing negotiability to this instrument which impresses me most is not referred to in the opinion of Judge Wallace in the federal court of appeals. *143 Fed. Rep. 805.*

I shall not take up the question whether the reference in this instrument to other papers affects this question of negotiability. There were some other objections to the finding in favor of the negotiability presented by counsel which I do not stop to recall. In my judgment it is sufficient to establish the fact that this instrument is not negotiable, to point out the condition which, at the start, confronts the purchaser of this piece of paper. The certificate starts out with an agreement on the part of the National Salt Company to pay to a party named, or to his order,

a sum of money, at the office of the American Trust Company, of Cleveland, Ohio, in ten equal semi-annual installments, beginning January 1st, 1900. The paper then provides that "The failure to pay any installment when due shall make all future installments become at once due and payable." It may be conceded that that provision does not affect the negotiability of the paper. The certificate then proceeds as follows:

"Until such default shall have occurred the National Salt Company may at any time cause its liability under this instrument to be discharged by paying the amount of all future installments hereby secured to The American Trust Company, of Cleveland, Ohio, in trust to pay the same to the registered holder hereof upon demand."

Now, who is the "registered holder" of this piece of paper? I confess that I have no difficulty—I do not see how there can be room for argument as to what person is intended by that phrase. The original option agreement, dated July 20th, 1899, signed by all these stockholders, under which they disposed of their holdings to the National Salt Company and took its stock, and took these certificates, provides for the form of certificate which the United stockholders are to receive in case this option is acted upon. The form of certificate is attached to this option agreement, and the agreement provides as follows:

"To evidence the agreement of the National Salt Company to make such payments, it shall execute and deliver to each owner its agreement substantially in the form shown in Exhibit 'A,' attached hereto and made part hereof. New agreements of like tenor shall be issued in lieu of said original or any reissued agreements, upon their surrender and cancellation, for such amounts as the holder may desire"——

("the holder may desire,"—the man who presents the certificate)

"not exceeding in the aggregate the amount then unpaid upon the agreements so surrendered and cancelled, and before such original or reissued agreements shall become binding upon said National Salt Company they shall be registered and countersigned by The American Trust Company, of Cleveland, Ohio, and the said Trust Company shall be required to keep a record of all agreements so registered and countersigned."

The certificate at the end contains this paragraph:

"This instrument shall not be valid until countersigned and registered by the said Trust Company."

Then follow the blank places for the signatures, and then we have these words: "Countersigned and registered," and then a blank place for the signature of the officer of the American Trust Company, which is required to countersign and register these papers.

Now, isn't that scheme perfectly plain? Every one of these certificates, when it was delivered, was countersigned and registered, and a record thereof kept by the American Trust Company. It was a promise, on its face, to pay the amount mentioned to the party named in the certificate, or his order. The party receiving that certificate could transfer it by endorsement, by delivery—could sell it to anybody; but the party who received this paper, it was expected, would come to the trust company, the registrar, and get his own certificate in his own name, and that would be countersigned and registered.

Of course, the paper would pass from hand to hand. It might go through the hands of a dozen owners, no one of whom might deem it worth while to go or to send out to Cleveland, Ohio (I think the trust company was located there), and surrender the certificate thus bought in the market and get a new one, countersigned and registered, in its place.

But during that period, perhaps, while one of these papers was going from hand to hand in New York on the street, there seems to be nothing to prevent the National Salt Company, under the terms of this express provision, from discharging itself from all liability by paying the amount of all future installments secured by this certificate to the American Trust Company, of Cleveland, Ohio, "in trust to pay the same to the registered holder hereof upon demand." "Hereof"—that means that paper. Who is the registered owner of one of these certificates after it has been sold perhaps four or five times and passed through four or five hands? Why, the registered holder is the party who appears upon the books of the trust company as the holder of that paper. There cannot be any other registered holder, according to this scheme, until the purchaser—owner of the paper—deriving title perhaps through half a dozen individuals, his predecessors, has

surrendered the certificate and obtained a new one which will be countersigned and registered and will show on its face that it belongs to him.

Now, that is an exposition which I am forced to make of the meaning of this agreement, and it seems to me that it is impossible to attribute negotiability to such a paper as that. The paper does not on its face bear a promise to pay the amount named to the holder or owner absolutely and at all events. As it passes from hand to hand every man who gets it by a title from the original registered holder knows right well—is warned—that no promise is made to him that is absolute. The only promise that is made to him is that the money will be paid if the National Salt Company has not seen fit to avail itself of the privilege which it reserves to itself in that paper of paying the entire amount to the trust company in trust for the registered holder, to be paid over to the registered holder on demand. All parties are acquitted if the money is paid by the National Salt Company to the trust company, and then is paid by the trust company to the registered holder on demand.

Now, it seems strange to me that this feature of the paper, affecting so vitally the question of its negotiability, has not been discussed in the series of interesting decisions in the federal court. I find a discussion of the question of negotiability only in the opinion of Judge Wallace, in the last decision of the series, in *143 Fed. Rep.*, and he deals with the effect of the reference in the certificate to other papers upon this question of negotiability. And, also, I might say, he deals with the effect of the provision in the certificate for the payment of the amount named therein in advance of its terms, but he does not deal with the effect of this particular provision which makes the right of the holder of the paper to receive payment conditional upon the money not having been paid by the National Salt Company to the trust company, and then paid over by the trust company to the registered holder.

If my conclusion on this question of negotiability is correct, then we have to deal with this case precisely as if the claims were made by the original takers of these certificates, and the question is, whether these certificates are enforceable in the hands

of the original parties who took them—the stockholders of the United Salt Company of Ohio—against the National Salt Company of New Jersey. ·

Four or five different defences were presented to the court, and were the subject of argument *pro* and *con,* which was very full and very satisfactory. I have just come from a re-perusal of all the briefs. I do not doubt, with the aid of those arguments, a final decision will be reached by the court of errors and appeals in this case which will certainly give to the parties the benefit of the best thought and the best judgment of that court. I have concluded not to take up these defences in order, not to discuss them, not to set forth any positive opinion in regard to them. I am satisfied that these papers—these certificates—are not enforceable contracts in the hands of the original takers against the National Salt Company, and therefore, as they are not negotiable, these present holders have no claim.

Without discussing very many of these defences, which have been the subject-matter of thorough argument by counsel, I think it worth while to point out perhaps what I might call one additional defect in these papers—one additional defence on behalf of the National Salt Company—which, it seems to me, is conclusive and which ought to be presented to the court above. Of course, it is altogether probable that another court might select some one or other of the defences which I am not going to deal with and sustain the action of the receivers and the action of this court on account of that defence. It seems to me, without dealing with these other defences that I have referred to, that the defence based upon the doctrine laid down by the court of errors and appeals in the case of *Volney* v. *Nixon, 68 N. J. Eq. (2 Robb.) 605,* is absolute. I have tried carefully to consider this matter—all the more carefully because it was not the subject of argument by counsel, and as a rule I am opposed to disposing of an important case upon a matter which has not been argued. I am not doing that in this case, by any means. I am only touching upon this one defence in order that it may be included in the presentation of the entire cause to the court of errors and appeals.

The case of *Volney* v. *Nixon,* as I read it, where we have the unanimous opinion, if I remember correctly, of the court of errors and appeals, through Mr. Justice Dixon, decides that an overissue of stock by a corporation in New Jersey—an original issue of stock—in violation of the distinct mandates of our statutes is against public policy and is therefore unlawful, not merely in the sense of its being *malum prohibitum,* but in the sense of its being *malum in se,* and that no right under a contract for such an overissue of stock is enforceable by any New Jersey court, and that any contract or agreement between parties for such a violation of the statute is as unlawful and as much against public policy as a contract for the maintenance of a lottery or a gambling house. By referring to the decisions cited by Mr. Justice Dixon, the true character of the doctrine laid down will plainly appear. It would seem that a contract involving necessarily the violation of our statutes which prohibit the overissue of stock is to be assimilated to the renting of a building for the maintenance of a disorderly house, and that where a party is seeking to enforce a contract involving such violation of our laws he is in the same position as when a man files a bill in this court for an accounting in respect of the profits of a gambling house.

Of course, when these papers were drawn, when these transactions were had out in Ohio, counsel in Ohio, and very few counsel, perhaps, in New Jersey, had any idea of the doctrine which was laid down in *Volney* v. *Nixon,* I think, in 1905. I may say here that I am very sure that the impression quite widely prevailed in New Jersey among lawyers who were engaged in conducting corporate enterprises involving issues of stock, consolidations, &c., that while the overissue of stock on a consolidation or upon the acquisition of property—issuing a million dollars, for instance, on a patent that was not actually worth more than $50,000—I say the impression, I think, generally prevailed that while such a transaction as that involved civil liability of various kinds, yet it was not to be considered as much more than *malum prohibilum,* and that men who united their properties and made schemes for issuing thereon large amounts of stock in excess of its value did not place themselves in the position of outlaws.

The case of *Volney* v. *Nixon* has been cited several times, and it is perhaps worth while to take a note of the citations of it. Reference may be had to the citation of the case by Mr. Justice Swayze, in the court of errors and appeals, in the case of the *Ecuadorian Association, Limited,* v. *Ecuador Company, 71 N. J. Eq.* (*1 Buch.*) 757. It is also cited by Vice-Chancellor Pitney in the case of *See* v. *Heppenheimer, 69 N. J. Eq.* (*3 Robb.*) 36, the citation being on page 50. It may be worth while to read a portion of pages 50 and 51:

"So far from approving these transactions" (that is to say, overissues of stock) "our court of errors and appeals has recently, in a case not yet reported, made a decision and rendered an opinion, in which it disapproves of these inflated transactions in the most emphatic and practical manner. I allude to the case of *Volney* v. *Nixon,* since reported (*68 N. J. Eq.* (*2 Robb.*) 605), the opinion in which I have had opportunity to examine, the headnote of which is as follows: 'A contract between two persons that, in exchange for their joint property, one of them shall procure from a corporation of this state an original issue of stock to an amount known by all parties to be in excess of the value of the property, and shall divide the stock thus procured from the other person, is illegal; and the courts of this state will not aid in its enforcement, even though the objectionable feature has been accomplished by the actual issue of the stock.' "

It is easy to see what very severe consequences will flow from applying that doctrine to a case where two or more convey their property to a corporation and unite in having an overissue of stock. It may very well be that the application of that doctrine will leave one of the parties plundered of his property, the whole of it practically in the possession of the other, and he being without remedy.

Now then, with that doctrine before us, what sort of a transaction is this that these parties went into? It seems to me very clear that the whole transaction by which the National Salt Company undertook to issue two million and a half dollars, par value, of its stock and give its obligation to pay over a million dollars more in cash for one million dollars, par value, of the

United Salt Company's stock was a direct, bald violation of our statutes. The proof is ample that no appraisement was ever made of the value of the United Salt Company's stock. First of all, we have the option agreement, signed by all the stockholders, or most of them, of the United Salt Company, by which they gave the National Salt Company an option to take their stock at a certain price, the price which was afterwards paid. For every one share of United Salt stock the holder was to have one and one-quarter shares preferred stock and one and one-quarter common stock of the National Salt Company, and then he was to have the certificate which entitled him to five annual payments amounting to $106.25. Why, it is perfectly plain—must be plain to everyone of common sense, upon perusing these papers— that all parties knew that this was an agreement for the exchange of stock in order to effect a consolidation. There isn't a suggestion that anybody had in view the actual value of the United Salt Company's stock, or the relation of that actual value to the two and one-half shares of the National stock and this peculiar obligation which accompanied it. The stockholders of the United Salt Company who signed this paper knew perfectly well that there was no appraisal of their stock and that a share of their stock, the stock of the United Salt Company of Ohio, was not worth even the par value of the two and one-half shares of National stock which they were to receive, disregarding the additional cash payment of $106.25.

It appears from the testimony that the stock of the National company was selling at the rate of $40 for the common stock and $75 for the preferred stock. Now, if you take one and one-quarter shares of each—I made a rough calculation—if you take one and one-quarter shares of each kind of stock at those prices, the total market value of the whole—one and one-quarter shares of common and one and one-quarter shares of preferred stock, with the full right to receive dividends thereon, was $143.75. The United stockholder, according to this agreement, was to hand over his share, one share of the United stock, and receive stock that was less by a very substantial sum in the market than $143.75, because that stock was stripped of all power to receive any dividend for five years. There is no evidence on the sub-

ject, but it is perfectly safe to infer that the actual value of that stock, thus denuded of all possible dividends for five years, as determined by the market value of the stock in its natural condition, should be put down very far below $143.75; it might safely be placed, perhaps, at something like $100.

What else did the United Salt stockholder get? Why, he received this obligation of the National Salt Company to make ten semi-annual installments aggregating $106.25, and if we make allowance—if we discount these payments so as to find out what the real value of that obligation was when that transaction occurred—I did not have time to make a calculation on here in pencil, but I made a rough calculation that the present worth of that obligation at the time this stock was exchanged would be about $90; I think not much more, if any.

And thus we have the United stockholder delivering his one share of the United Salt Company's stock and receiving therefor money and stock which was not worth more than about $190 or $200 at the most. Can there be any doubt about it that every holder of the stock of the United Salt Company knew right well that his stock was not worth $250, not to say $356.25?

I spent some time last night in trying again to go through the very voluminous testimony in this case, to discover every particle of direct testimony in regard to the value of the United Salt Company stock. I may have overlooked something, and I should be very glad if counsel would correct any error in what I may say on this subject. I only found one piece of testimony and that is contained in the letter from Mr. Squire, the president of the United Salt Company, and a large stockholder, evidently, and the man who conducted this transaction on the part of the Ohio company to a very large extent, and he must have been fully informed in regard to all values so far as anybody knew anything about them.

He offered for sale a thousand shares of his stock (which I understand is the stock of the United Salt Company of Ohio) for sixty, and he offered to sell another thousand shares for sixty-five, and he offered to sell out all his holdings, I think, for about sixty-five. Well, it is not shown that all of these certificate-holders knew of that fact. But here we have stock which the

president of the company, and a man who is perhaps more largely engaged in operating it than anybody else, offers to sell for from sixty to sixty-five. We have an agreement which, right on its face, shows that it is an exchange of stock, and does not suggest an appraisement of the stock of the United Salt Company of any kind whatever. When we look at what the stockholders of the United Salt Company got, and presumably must have known they were getting, we find that they were taking an original issue of stock from the National Salt Company of the par value of $250, which would not sell in the market for $143.75, stripped of all right to dividends as it was for a period of five years.

It is incredible to my mind that any stockholder of the United Salt Company of Ohio could have supposed that his stock was worth even $250. If the new issue of $2,500,000, par value, of the National stock was to be honestly issued in accordance with the laws of New Jersey, the $1,000,000 of stock, par value, of the United company had to be worth $3,562,500, less the allowances or discounts to which I have heretofore referred.

It may be worth while to note that this Ohio scheme, if lawful, suggests a very simple means for evading the statutes of New Jersey, which limit an original issue of stock for property purchased to the actual value of such property.

In my judgment this is a plain case where all parties to this transaction—to this complicated agreement—for the exchange of stocks of these two companies in order to effect this consolidation are charged with notice that an issue of stock would be made, and was to be made, in pursuance of their agreement, in direct violation of the laws of New Jersey, and that, therefore, under the ruling in *Volney* v. *Nixon,* no agreement, no contract which is a part of that arrangement, which is a part of that agreement, is enforceable against the National Salt Company.

If I have misunderstood, or in any way have misapplied, the doctrine laid down in *Volney* v. *Nixon*—if a stockholder of the United Salt Company could enforce any legal claim upon this obligation of the National Salt Company in the courts of New Jersey—it would seem that an appraisal would have to be made first, to ascertain what was the actual cash value of the United

stock when this exchange was made. Nothing would be recoverable until $250 in cash value of the Ohio stock had been paid for every two and a half shares of the National stock. It is very evident that even on this theory, nothing would be found due to any of these appellants.

I do not think of anything further to say. This is only a small part of this important and complicated case, but it is all it is necessary, it seems to me, to deal with in order to dispose of the case, so far as this court is concerned.